DON GEORGE, Inc. et al. v. PARAMOUNT
PICTURES, Inc. et al.

Civ. No. 3050.

United States District Court
W. D. Louisiana, Shreveport Division.

Sept. 18, 1951.

Pyburn & Pyburn, Smallenberger & Eatman, and Jackson, Mayer & Kennedy, all of Shreveport, La., for plaintiffs.

Rosen, Kammer, Hopkins, Burke & Lapeyre, New Orleans, La., and Wilkinson, Lewis & Wilkinson, Shreveport, La., for defendants.

PORTERIE, District Judge.

Ruling on Motion to Quash and the Plea of Want of Jurisdiction.

█ The facts of the complaint have to be taken as proved for the purpose of passing on the motion to quash and the plea to dismiss for want of jurisdiction.

Complainants' original petition was served on Paramount Pictures, Inc., which excepted on the grounds that it was fully dissolved as a corporation on December 30, 1949.

Complainants' supplemental and amended petition has made parties to this suit both successor corporations of Paramount Pictures, Inc., namely, Paramount Pictures Corporation and United Paramount Theatres, Inc.

Service of the original petition was made on the defendant-producers listed above and also on Twentieth Century Fox, through the Secretary of State in Baton Rouge, Louisiana. Twentieth Century Fox submitted to the jurisdiction, but the other producer-defendants filed motions to quash, contending this to be improper service.

Then the complainants followed the procedure outlined in Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684, and had each of the moving defendant-producers cited by the U. S. Marshal at their principal place of business.

Defendants' contention now is that, although good service has been made, it is ineffectual since these corporations are not subject to suit in Louisiana.

Defendants have filed affidavits to the effect that they are not now doing or have ever done business in the State of Louisiana, and do not now have or ever have had offices, agents, or employees doing business in the State. This does not completely refute the allegations of the following article of the complaint:

Article 8(e):

"(e) That the defendant Radio-Keith-Orpheum Corporation is a corporation duly organized and existing

under the laws of the State of Delaware, with its principal office, place of business and residence at 1270 Sixth Avenue, New York City, County of New York, State of New York. *It is engaged in the business, among other things, of producing, distributing and exhibiting motion picture film, either directly or through associated or affiliated companies, in various parts of the United States and foreign countries.* That this defendant is found and has agents working in Caddo Parish, Louisiana, and further, during the period covered by this suit as shown hereafter, transacted business and is presently transacting business in Caddo Parish, Louisiana." (Emphasis supplied.)

The complaint contains the same allegation for each of the other producer-defendants which have filed motions to quash. Article 8(c), (2), (g), and (1).

We have to accept that the producer-defendants exhibited motion picture films, either directly, or through associated or affiliated companies, in Caddo Parish, Louisiana.

The complaint says:

"9. That the defendants, Paramount Pictures, Incorporated, Radio-Keith-Orpheum Corporation, Warner Brothers Pictures, Incorporated, and Twentieth Century Fox Films, each engage in the exhibition branch of the motion picture industry throughout the United States and foreign countries, through associated or affiliated companies, through various stock ownerships, joint interests, contracts, and agreements so varied in nature, so numerous, and subject to such frequent change that it is impractical to name and describe them herein. In the Shreveport area the exhibition business of Paramount was during the period covered by this suit conducted through Saenger–Ehrlich Enterprises, Incorporated and Paramount–Richards Theatres, Inc.

"10. That the defendant Saenger–Ehrlich Enterprises, Inc. was owned one-half by Paramount Richards Theaters, Incorporated, and until recently one-half by certain partners. That plaintiffs are informed and therefore allege that Paramount Richard Theatres, Inc. presently own all the stock of Saenger–Ehrlich Enterprises, Inc. That Paramount Richards Theaters, Incorporated, owned and operated numerous theaters throughout Mississippi, Louisiana and Texas. That Paramount Pictures, Incorporated, owned a substantial amount of the stock of Paramount Richards Theatres, Incorporated.

"11. That all the defendants were doing business during this period beginning June 1st 1938 as aforesaid, and the transactions herein complained of were in interstate commerce. The motion picture films were transported across state lines, and the contract arrangements therein all being negotiated among the several states and across state lines."

We should assume that the defendants carried on business in this manner, not only here but in all other parts of the United States.

This type of activity is "transacting business" in Louisiana, although the defendants may not be "found" or may not be "doing business" in the usual sense of the word. The Louisiana corporations were agents of the defendant-producer corporations the same as if they had employed agents to work continuously here.

In Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 47 S.Ct. 400, 403, 71 L.Ed. 684, the United States Supreme Court said the following, regarding Sec. 12 of the Clayton Act, 15 U.S.C.A. § 22:

"And we think it clear that, as applied to suits against corporations for injuries sustained by violations of the Anti-Trust Act, its necessary effect was to enlarge the local jurisdiction of the district courts so as to establish the venue of such a suit not only, as theretofore, in a district in which the corporation resides or is 'found,' but also in any district in which it 'transacts business'—although neither resid-

ing nor 'found' therein—in which case the process may be issued to and served in a district in which the corporation either resides or is 'found'; and, further, that a corporation is engaged in transacting business in a district, within the meaning of this section, in such sense as to establish the venue of a suit—although not present by agents carrying on business of such character and in such manner that it is 'found' therein and is amenable to local process—if in fact, in the ordinary and usual sense, it 'transacts business' therein of any substantial character. This construction is in accordance, not only with that given this section by the two lower courts in the present case, but also with the decisions in Frey & Son v. Cudahy Packing Co., D.C., 228 F. 209, 213, and Haskell v. Aluminum Co. of America, D.C., 14 F.2d 864, 869. And see Green v. Chicago, B. & Q. Ry., 205 U.S. 530, 533, 27 S.Ct. 595, 51 L. Ed. 916, in which it was recognized that a corporation engaged in the solicitation of orders in a district was in fact 'doing business' therein, although not in such sense that process could be there served upon it."

We believe that in Jeffrey–Nichols Motor Co. v. Hupp Motor Car Corporation, 1 Cir., 46 F.2d 623, the court in reaffirming this principle held that a foreign corporation to be "transacting business" within a local judicial district under the anti-trust venue statute need not maintain an office or place of business or the presence of agents soliciting or taking orders—if it has a well-defined plan of promoting the sale of its products—if it has contracted with so-called distributors and it retains a general oversight and control under its contract it is clearly transacting business within the meaning of Section 12 of the Clayton Act, 15 U.S.C. § 22, 15 U.S.C.A. § 22, sufficient to establish a venue in a district where such acts are done.

See, also, Northern Kentucky Tel. Co. v. Southern Bell Tel. & T. Co., D.C., 54 F. 2d 107.

Under Articles 17 and 18 of the complaint, it is alleged that complainants were forced to sign contracts controlled and approved by defendant-producers, which contracts contained minimum prices to be charged for each picture, discriminating clearance clauses, and other allegedly illegal features.

The impact of these contracts falls on Shreveport and vicinity. These foreign corporations were controlling Louisiana business. Since we know, from the cases cited above, that it is not necessary to have outlets and agents here in Louisiana to "transact business", these allegations, taken as true, show defendants to have performed these acts and are, therefore, amenable to suit here in Louisiana.

Moreover, these quoted factual allegations are corroborated as prima facie evidence, as found in the consent decree entered into by Paramount Pictures, Inc., dated March 3, 1949; paragraph 62377 of CCH Trade Regulations; consent decree entered into by RKO Radio Pictures, Inc., dated November 8, 1948; paragraph 62335 CCH Trade Regulations; final decree against Warner Bros. Pictures Corp., dated February 8, 1950; paragraph 62573 CCH Trade Regulations; final decree against Columbia Pictures Corp., dated February 8, 1950, paragraph 62573 CCH Trade Regulations.

We should remember just here the language of Section 5 of the Clayton Act, 15 U.S.C.A. § 16, without quoting it.

In keeping with DeLuxe Theatre Corp. v. Balaban & Katz, D.C.1951, 95 F. Supp. 983, paragraph 62790 of CCH Trade Regulations, we must consider the above consent decrees in the same category as final judgments as far as using them as prima facie proof of the acts charged.

A reading of the Paramount Consent Decree on March 8, 1949, shows that every allegation of the complaint has its counterpart in a section of the decree. This Paramount decree affects and controls the actions of the monopolists down to the local Shreveport area level, since it requires that Paramount divest itself of four of its local "circuit" theatres.

The defendants have carried out this illegal business in Louisiana. The process is good; the venue is good.

In the case of United States v. Scophony Corporation of America, 333 U.S. 795, 68 S.Ct. 855, 92 L.Ed. 1091, we find the Court extending the definition of "transacting business" as used in Section 12 of the Clayton Act to such illegal acts as entering into monopolistic master agreements and acts totally foreign to the corporation charter; such as, borrowing money, licensing and exploiting its patents by other means.

The Scophony case, supra, shows the gradual evolution of Section 12 from the hide-bound and ancient interpretation put on the term "transacting business" to the new idea given it by this type of case. The principles set forth in the Scophony case line up with the concept that the forwarding of illegal contracts all over the United States, including Louisiana, by these defendants, and the working out of master agreements between producer-defendants, which had their effect in the State of Louisiana, is "transacting business" in Louisiana in accordance with the latest interpretation by the United States Supreme Court. Also, every time a motion picture is shown in Louisiana, the property of the defendant-producer is present and circulating in the trade channels of the State.

The defendants place their faith in three district court cases; namely: Westor Theatres v. Warner Bros. Pictures, D.C., 41 F. Supp. 757; Hansen Packing Co. v. Armour & Co., D.C., 16 F.Supp. 784; and, Mebco Realty Holding Co. v. Warner Bros., D.C., 45 F.Supp. 340.

We believe that the Westor case, supra, has been overruled in the case of Giusti v. Pyrotechnic Industries, 9 Cir., 156 F.2d 351, 354, certiorari denied Triumph Explosives v. Gusti, 329 U.S. 787, 67 S.Ct. 355, 91 L.Ed. 675, by the following language:

"If the case of Westor Theatres v. Warner Bros., D.C.E.D.N.J., 41 F. Supp. 757, 760, holds to the contrary,

we find no merit in its reasoning. To follow it would be to frustrate the purpose of the Congressional legislation against monopolistic conspiracies in many cases."

These three cases were decided at a time when the courts had no prima facie consent decees and judgments to consider.

The motions to quash and the pleas of want of jurisdiction, filed by Paramount Pictures Corp., United Paramount Theatres, Inc., Radio-Keith-Orpheum Corporation, Warner Bros. Pictures Corporation and Columbia Pictures Corporation, are, hereby and herewith, overruled and denied.

It is so ordered.

### Ruling on Plea of Prescription.

The Sherman and Clayton Acts, 15 U. S.C.A. §§ 1–7, 15 note, 12 et seq., do not contain any period of prescription. What is the Louisiana law to cover this particular case?

The defendants advance (and, we admit, with much weight and force) that the one-year prescription, established by Article 3536 of our LSA–Civil Code, is, undebatably the one to apply.[1]

In Caillouet v. American Sugar Refining Co., D.C.1917, 250 F. 639, 640, Judge Foster said:

"The general rule is not disputed by plaintiffs, but they contend a cause of action based on the Sherman Law is sui generis and does not sound in tort. With this I cannot agree. In my opinion this case is identical in principle with other cases based on fraud and deceit, which have always been held to come under the general rule. And, as it cannot be said Mrs. Burguieres was damaged in any particular property or that there was an implied promise on the part of defendants to reimburse

---

1. "The following actions are also prescribed by one year:

"That for injurious words, whether verbal or written, and that for damages caused by animals, or resulting from offenses or quasi offenses. * * *" Louisiana Statutes Annotated, Civil Code, Art. 3536.

The time at which this period of prescription begins to run is set forth in the succeeding Article 3537, as follows:

"The prescription mentioned in the preceding article runs:

* * * * *

"And in the other cases from that on which the injurious words, disturbance or damage were sustained."

her, it follows that the cause of action abated with her death."

The preceding paragraph in this case reads as follows:

"At common law as a general rule all actions ex delicto abate with the death of either party. Exception was made in some cases, as where the decedent had been deprived of particular property and his estate diminished by the wrongful act. But this was on the theory that the duty of the wrongdoer to return the property created a quasi contract." 250 F. at page 640.

If we had the facts as to what constitutes a violation of the Sherman Anti-Trust Act in the Caillouet case, supra, we should then appreciate why Judge Foster called it a tort action. We do not know at this time enough of the facts of the instant case to classify the action as in tort or an action in quasi contract. Conclusively, we have not the facts in either case; then we are unable to make definitely satisfactory use of the Caillouet case, supra, at this time.

The Caillouet case, supra, does say that the violation before it of the Sherman Law is not sui generis; but, does it say that all violations of the act are torts? It is good and valid in saying that the case decided, from its facts, was a tort.[2] We are inclined to believe that each violation of the Act, according to its facts, is to be classified.

Finally, the Caillouet case, supra, is only a district court case. Judge Foster was speaking in the year 1917, thirty-three years ago.

The defendants make a strong point at law in that, as early as in 1913, they claim the Fifth Circuit accepted (it being conceded—by agreement) in the case of American Tobacco Co. v. People's Tobacco Co., 204 F. 58, that an action brought under the "Sherman Anti-Trust Act" prescribed in one year as a tort. That case, in part, reads as follows:

"The only question made on this writ of error is whether the suit was brought in time, the defendants pleading the prescription of one year under the law of Louisiana, and it is conceded that that is the prescribed time for such actions in Louisiana." 204 F. 58, at page 60.

The attorneys for the plaintiff were not prone to make a fight to have the 10-year prescription to apply, because they knew the facts of the case would suspend the running of the prescription so as to make one year safe for them. One year was all the time they needed. The reading of the case proves this. They won handily under the strictness of the one-year rule. So, really, this Tobacco case, supra, does not settle the point as to which prescription applies. A decision in our Louisiana jurisprudence is authority only for what was held in the case. Moulin v. Monteleone, 165 La. 169, 115 So. 447.

The defendants say it is a prescription of one year as for a simple tort. The plaintiffs say that the case comes squarely

2. The facts of the Caillouet case, supra: "The petition alleges, in substance, that Mrs. E. D. Burguieres was engaged in planting cane and manufacturing sugar from 1891 to 1904, when she died; that during that period the defendants were engaged in a conspiracy to monopolize the sugar refining business of the United States, and in pursuance of their plan depressed the raw sugar market; that Mrs. Burguieres sold her sugar at prices based on the open market and suffered damage in consequence of the unlawful acts of the defendants; that plaintiffs are the sole owners of Mrs. Burguieres' right to recover for the said damage; that the first 3 named plaintiffs are heirs of Mrs. Burguieres and together with the corporation acquired the interests of the other heirs by notarial act. Defendants except to the petition on the ground that any right of action in Mrs. Burguieres abated with her death and hence was neither heritable nor assignable." 250 F. at pages 639–640.

Judge Foster held the action to be in tort; consequently, under the law of Louisiana, the action had abated and he dismissed the suit.

The facts in this case (though quite undeveloped as yet and only to be well appreciated after trial on the merits) are quite different, as the reading of the instant complaint immediately shows.

within the rule established by our lawmakers that, where no other term of prescription liberandi causa has been provided governing personal actions, the term is ten years under Article 3544 of the Louisiana Statutes Annotated–Civil Code.

The Acts under which we are proceeding in the first paragraph create an offense and clearly the provisions of this section are for the protection of the general public. 15 U.S.C.A. § 1.

The section, however, under which this action is brought, 15 U.S.C.A. § 15, is entirely a different statute and creates new obligations. It reads as follows:

"Any person who shall be injured *in his business or property* by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." (Emphasis supplied.)

When the lawmakers created this right in favor of those injured only in their "business or property", it cannot be said it was dealing with the general public. When it further provided that such action might be brought in the District Court of the United States without regard to amount in controversy or diversity of citizenship, it emphasizes the fact that it is a special right granted by the statute; and, when it stipulates that the recovery shall be threefold the damages sustained and, additionally, an attorney's fee, it settles beyond the question of a doubt the fact that we are not dealing with an ordinary tort action. It may be conceded that the operation of a conspiracy such as is charged here is an offense or probably a quasi offense or tort insofar as it affects the general public, but that arises from general law and not from this special statute. The injury sustained by any member of this group is not an injury to "his business or property" by reason of anything forbidden by the statute and, if he could show damage, his action therefor would be controlled by

the rules as to amount in controversy and diversity of citizenship so far as this court is concerned. Further, his recovery under the general law would only be for the amount of damage sustained and he would not be entitled to attorney's fees. Upon what theory then can it be said that, merely because this same statute gives rise to the two thoroughly distinguished causes of action, they are similar and, therefore, since one is a tort or an offense or a quasi offense, the other is likewise?

The distinction between the two periods of prescription has been expressed by an opinion by the Louisiana Court of Appeal for the Second Circuit in Whitten v. Monkhouse, 29 So.2d 800, 804:

"The distinction with regard to the prescriptive periods as between actions ex delicto and actions which are both ex delicto and quasi ex contractu is aptly and plainly made in the case of Prudential Savings & Homestead Society v. Gondolf, No. 7169, Court of Appeal, Orleans Parish, Teissier's Digest, p. 142. See Louisiana and Southern Digest, as follows:

" 'Where the unlawful act of one person simply damages another without resulting benefit to the wrongdoer, there is a simple tort; and the action for reparation is prescribed by one year.

" 'Where the unlawful act of one person not only damages another, but also enriches the wrongdoer, there arises an action both ex delicto and quasi ex contractu and the action to recover the unlawful gain is barred by the prescription of ten years.' "

Another opinion in which our Supreme Court, speaking through Justice St. Paul, has tersely stated rules applying to prescription and distinguishing different forms of actions is Lagrone v. Kansas City Southern Ry. Co., 157 La. 559, 102 So. 669, where the action was brought against the carrier for a violation of the carrier's obligation under the Interstate Commerce Act, 49 U.S.C.A. § 1 et seq. The Court there clearly recognized that the same act may be a tort and at the same time the violation of a duty imposed by law which

is in the nature of a quasi-contractural obligation. It is there pointed out that, where there is a special obligation or contract for the performance of duties otherwise imposed by law, the injured party may claim his damages under the contract instead of for the tort and, if so, his action is only prescribed by ten years. See, also, Gordon v. Stanley, 108 La. 182, 32 So. 531; Weintz v. Kramer, 44 La.Ann. 35, 10 So. 416; Fox v. Thibault, 33 La. Ann. 32; Brigham v. Bussey, 26 La.Ann. 676, 677; Brown v. Gunning's Curatrix, 19 La. 462; Poydras v. Patin, 5 La. 324, 327.

█ It is clear from an analysis of these principles that, where a statute is enacted for the benefit not of the general public but of certain particular persons, a violation of the statute so far as they are concerned creates a quasi-contractual obligation.

The Court in the Lagrone case, supra, then affirms the rule in City of New Orleans v. Southern Bank, 31 La.Ann. 560, 567, as follows [157 La. 559, 102 So. 670]:

> " 'The distinction between damages ex delicto and ex contractu is that the latter ensue from the breach of a special obligation, and the former from the violation of a general duty.' "

For varying differentiations between the tort action and the action quasi contractu (personal action) consult the following cases: Succession of Gillaspie, 35 La.Ann. 779; Walling Heirs v. Morefield, 33 La. Ann. 1174, 1179; Nahigian, Inc. v. Haddad, 205 La. 1009, 18 So.2d 598; Miller v. Miller, 207 La. 43, 20 So.2d 419; Bryceland Lumber Co. v. Kerlin, 143 La. 242, 78 So. 482.

We are unable to decide, as a matter of law, for the want of all the facts in the instant case; moreover, there is conflict on the facts and, more importantly, on the inferences to be made from the facts. All this points this case as for the jury on this point.

From the nature of the relation of the parties, granting that a conspiracy existed and that the Clayton Act was violated, was there then the commission of a simple tort as to these plaintiffs or was there the breach of a quasi contract? The one calls for the prescription of one year; the other calls for the prescription of ten years.

A tort; one thinks of an accident; injury of one through the neglect of another—but without the enrichment of the tortfeasor. The automobile accident at the street corner is a good example of the basic tort.

But here, we have people engaged in the entertainment business through the use of the moving picture. It has been developed into a tremendous enterprise, highly organized. The plaintiffs are grooved in one of the phases of this great operation. The complaint discloses the number of means by which their business freedom is throttled. Are not all the participants in this nationwide picture enterprise legally related? And not one single move is made that may affect the plaintiffs' business but that it is made to enrich the planners of it. Is that the offense or the quasi offense of our Code to be governed in relief from suit by the laches of one year? Or, is this the violation of an implied obligation, with coveted profit to the violator, under a quasi contract and, therefore, under Article 3544 of the Louisiana Statutes Annotated—Civil Code, prescriptible only in ten years?

The degree of punishment, three times the actual loss in the particular case, is measured upon the money loss of the claimant for the injury. Only a quasi contract, and certainly not a tort, may give an award based on money or property loss.

But there is another phase of the question of prescription to this case. This is the one arising under the provisions of Section 5 of the Clayton Act:

> "Whenever any suit or proceeding in equity or criminal prosecution is instituted by the United States to prevent, restrain, or punish violations of any of the antitrust laws, the running of the statute of limitations in respect of each and every private right of action arising under said laws and based in whole or in part on any matter complained of in said suit or proceeding

shall be suspended during the pendency thereof." 15 U.S.C.A. § 16.

In the Paramount case, U. S. v. Paramount Pictures, Inc., which is referred to in Articles 14 and 15 of the complaint herein, after the taking of a great deal of testimony, the United States court handed down an opinion on June 11, 1946, which is reported in D.C., 66 F.Supp. 323. On December 31, 1946, the court made findings of fact and conclusions of law relating to the unlawful conspiracy of the defendants to monopolize the distribution and exhibition of motion pictures all over the United States, including the Shreveport area. These findings may be found in D.C., 70 F.Supp. 53.

On May 3, 1948, the Supreme Court of the United States affirmed in part and reversed in part the judgment of the lower court and remanded the case to the district court for proceedings in conformity with its opinion. United States v. Paramount Pictures, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260. The Supreme Court eliminated from the decree the provisions for a system of competitive bidding.

On July 25, 1949, an opinion was handed down by the United States District Court after further proceedings on remand and that opinion was reported in D.C., 85 F. Supp. 881. In the meantime, a consent decree was rendered as to RKO on November 8, 1948; and a consent decree was rendered as to Paramount on March 3, 1949.

The entry of the RKO consent decree is properly admissible under the allegations of the complaint for the purpose of tolling the statute of limitations under Section 5 of the Clayton Act since the litigation is apparently still pending as to RKO in view of the broad language used in paragraph retaining jurisdiction in said decree as follows:

"Jurisdiction of this cause is retained for the purpose of enabling any of the parties to this consent decree to apply to the Court at any time for such orders or direction as may be necessary or appropriate for the construction, modification or carrying out of the same, for the enforcement of compliance therewith, and for the punishment of violations thereof, or for other or further relief."

Since jurisdiction is retained for the punishment of violations of the decree and "or for other or further relief" the litigation is still pending; although the decree is final in that it finds RKO guilty of violations of the antitrust laws as to issues closed by the decree of the Supreme Court.

The plaintiffs maintain that due to the use of similar language in the paragraph retaining jurisdiction in the Paramount consent decree the litigation is still pending as to Paramount and such pendency is therefore tolling the statute of limitations.

As further evidence that the litigation was still pending in January, 1950, counsel for RKO appeared in the Paramount case, Equity No. 87–273, on January 18, 1950, and presented, and the court made and directed the entry of, an order styled United States v. Radio-Keith-Orpheum Corporation, et al., severing and terminating, as of November 8, 1948, the suit as against the RKO defendants.

In the case of Twin Ports Oil Co. v. Pure Oil Co., 26 F.Supp. 366, the United States District Court for the District of Minnesota held that the statute of limitations against plaintiffs" claim was suspended since the Madison case No. 1, U. S. v. Standard Oil Co., Indiana, D.C., 23 F.Supp. 937, was still pending. This was a criminal prosecution by the United States against Pure Oil Co. and others involving the same issues.

Under the language of the consent decrees, these decree are properly set forth in the pleadings and are admissible as prima-facie evidence as final decrees rendered in a proceeding brought by the United States under the antitrust laws to the effect that the Paramount and RKO defendants who were defendants in the Paramount case have violated said laws. The consent decrees do not come within the exception of Section 5 of the Clayton Act since they are final judgments rendered after the taking of voluminous testimony in the District Court.

It matters not that the Paramount consent decree was rendered after the taking

of evidence upon the remand of the case by the Supreme Court but without the rendition of any decision by the District Court upon any of the issues and matters which were to be determined upon said remand. Nor is it material that the RKO consent decree was rendered before the taking of any testimony upon the issues and matters open upon the remand of the case or that the decree recites that the decree shall not be construed as an admission by the RKO defendants that they have violated any statute or law with respect to the issues and matters left open on remand. It therefore follows as to both consent decrees that they were based upon testimony taken in findings made that RKO and Paramount had violated the antitrust laws as to all matters and issues which were not left open by the decrees.

On June 25, 1948, the District Court made the mandate and decree of the Supreme Court the order and judgment of the District Court. In rendering the consent decrees the District Court therefore had the benefit of the findings of fact and conclusions of law upon which the Supreme Court based its affirmance, in part, of the lower court's judgment.

Among the findings included by the Supreme Court and not left open by its decree were:

a. That a price fixing combination is illegal;

b. That an agreement between exhibitors and distributors of motion pictures to maintain a system of clearances is a restraint of trade in violation of the federal antitrust laws;

c. That joint ownership of theatres by distributors and exhibitors constitutes a restraint of trade in violation of the federal antitrust laws;

d. That formula deals and master agreements are also restraints of trade in violation of the federal antitrust laws.

The effect of the impact of these illegal practices upon the business of independent exhibitors is graphically described in the words of the Supreme Court in the Paramount case as follows:

"* * * The trade victims of this conspiracy have in large measure been the small independent operators. They are the ones that have felt most keenly the discriminatory practices and predatory activities in which defendants have freely indulged. They have been the victims of the massed purchasing power of the larger units in the industry. It is largely out of the ruins of the small operators that the large empires of exhibitors have been built." United States v. Paramount Pictures, 334 U.S. 131, 162, 68 S.Ct. 915, 931, 92 L.Ed. 1260.

In answering the point that considerable testimony was taken before the decision of the expediting court in 1946, the defendants state that in remanding the case the Supreme Court undoubtedly opened up the case for reconsideration by the lower court. It did not, however, grant a new trial. The judgment of the expediting court was affirmed in part and reversed in part by the Supreme Court and the case was remanded in the District Court for proceedings in conformity with its opinion.

Under the circumstances of the remand, it will not do to say that the Supreme Court granted the defendants a new trial as the defendants contend, since it must be borne in mind that the judgment was affirmed in part, that is, as to many findings of fact and conclusions of law with reference to violations of the antitrust laws by the defendants and reversed in part but the reversal was made largely to enable the district court to solve the problem of divestiture.

It appears that in order to give third parties, such as plaintiffs herein, the benefit of pleading the consent decrees for use as prima-facie evidence a careful distinction was made in the consent decrees between issues which had been closed by the decision of the Supreme Court and issues such as the problem of divestiture which were left open for determination by the District Court on remand.

No new trial was granted by the Supreme Court and there was no new trial on remand. The proceedings in the District Court, after remand, were a continuation

of the trial that had resulted in the judgment of December 31, 1946.

The case of DeLuxe Theatre Corporation v. Balaban & Katz Corporation, D.C., 88 F.Supp. 311, is cited by defendants in their brief in support of their position that the references to the RKO and Paramount consent decrees should be stricken since they would not be admissible. We believe that to be incorrect. For, read the following langauge of the case:

> "It appears that defendants are not entitled to rely upon the protection of Section 5 of the Clayton Act which provides that a final decree rendered in a proceeding brought by the United States shall be prima facie evidence in a suit subsequently brought by any other party, except where a consent decree is entered before any testimony has been taken. In the New York case [U. S. v. Paramount Pictures, Inc.] a trial was had and, upon appeal, the Supreme Court affirmed in part and reversed in part and remanded the cause, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260. However, it should be noted that it was remanded for further proceedings and not for a new trial. In actuality, therefore, there was not a trial de novo, but rather a continuation of the previous trial, where certainly considerable testimony had been heard. The clear purpose of Section 5 is to induce defendants in actions of that type to submit to prompt capitulation, and it cannot logically be contended here that the consenting defendants promptly capitulated. * * *

> "The Court is unable to agree with defendants' contention that, since the New York case was concerned with a nation-wide conspiracy, the decrees entered therein should not be available to a plaintiff alleging merely a local conspiracy. The previous decrees should be available to the plaintiff to show the existence of a conspiracy and the violation of the public interest. Obviously, it is incumbent upon the plaintiff to demonstrate the impact of that conspiracy upon plaintiff in the local sphere, but this does not mean that, in the prior case, the government was obliged to litigate all the issues that might arise in any given locality. The case of Emich Motors Corp. v. General Motors Corp. [340 U.S. 558], 71 S.Ct. 408, 415 [95 L.Ed. 534] is illustrative of this point." [3]

From the foregoing, it appears that the DeLuxe Theatre case does not support the contention of the defendants that the so-called consent decrees entered as to Paramount and RKO should be stricken. As a matter of fact, the only reason that paragraphs 24 and 25 were stricken in that case was because of the allegations by plaintiff that the final adjudication in the Paramount case conclusively determined the issues in the DeLuxe case and that defendants were thereby estopped from relitigating any of the issues so previously adjudicated. Of course, these allegations were too broad under the Clayton Act since the prior adjudications only constitute prima-facie evidence of the violations of the antitrust laws by defendants.

The teaching of the DeLuxe Theatre case is that although a judgment which is entered by the consent of defendants in a prior government case is not ordinarily admissible in a later civil action as prima-facie proof of the commission of the unlawful acts charged in the prior action, this is not true when the consent decree is entered after testimony has actually been heard, as where, after the original hearing, the case is appealed to the Supreme Court and is remanded for further proceedings but not for new trial. The further proceedings required are a continuation of the earlier proceedings.

The DeLuxe case further holds that nothing prevents the submission of a judgment from a prior government action as prima-facie evidence in a later trial although the former trial may have been upon allegations of nation-wide restraints

---

3. The two above-quoted paragraphs are from the DeLuxe case when the court passed upon it a second time, reported in D.C., 95 F.Supp. 983, at pages 985–986.

and the later trial largely upon local restraints.

▮ Moreover, the entry of the decrees in the Paramount case and of the acts and conduct enjoined thereby are also admissible as prima-facie evidence under Section 5 of the Clayton Act against United Artists Corporation, Columbia Pictures of Louisiana, Inc., Warner Brothers Pictures Distributing Corporation, and Twentieth Century Fox Film Corporation. The final decree as against Columbia, United Artists and Universal was rendered in the District Court on February 8, 1950. The final decree was rendered on the same date as to Twentieth Century Fox, Loew's and Warner Brothers, U. S. v. Paramount Pictures, D.C., 70 F.Supp. 53, which was affirmed by the Supreme Court of the United States in a memorandum opinion on June 5, 1950, Twentieth Century-Fox Film Corp. v. U. S., 339 U.S. 974, 70 S.Ct. 1032, 94 L.Ed. 1380.

The two decrees of February 8, 1950, above referred to, and the decree of December 31, 1946, which was amended by the decrees of February 8, 1950, are also admissible for the purpose of showing that the statute of limitations was tolled until February 8, 1950, as to Columbia Pictures of Louisiana, Inc., and United Artists Corporation and until June 5, 1950, as to Twentieth Century Fox Film Corporation and Warner Brothers Pictures Distributing Corporation.

On the other hand, the defendants, with apparently equally cogent reasoning, for fifteen pages of their brief, phase by phase, angle by angle, show that the tolling of the statute because of the pendency of the Paramount case does not save the case of the plaintiffs.

Here is the brief chronological history they give of the procedural steps in United States v. Paramount.

July 20, 1938 — Complaint filed.
November 14, 1940 — Amended complaint filed.
November 20, 1940 — RKO, Warner, Loew's Paramount and Fox entered consent decree.
August 7, 1944 — Government moved to modify.
March 5, 1945 — Hearing on motion for preliminary injunction on clearance.
June 13, 1945 — Government filed application for information of an Expediting Court.
November 1945 — Hearings were held on all issues framed by 1940 pleadings.
June 11, 1946 — Opinion of Expediting Court.
December 31, 1946 — Entry of Findings of Fact, Conclusions of Law and Decree.
May 3, 1948 — Supreme Court affirmed in part, reversed in part and remanded for further proceedings.
November 8, 1948 — RKO Consent Decree.
March 3, 1949 — Paramount Consent Decree.
February 8, 1950 — Decrees entered against Loew's, Fox, Warner, Columbia, Universal and United Artists.

Then, in a very scholarly and thorough manner, the following subjects are fully treated:

a. In legal effect a consent decree is indistinguishable from a contested decree.

b. The introductory clauses of the 1940 consent decree are similar to clauses in almost every consent decree.

c. The clause preventing the Government from applying for further relief within three years did not cause that case to remain pending against these defendants.

d. The provisions permitting modification of the 1940 consent decree without showing any change in conditions does not affect its finality.

e. The history of United States v. Paramount, et al., subsequent to the entry of the November 20, 1940 consent decree demonstrates the finality of that decree.

And their conclusion is that the suit of plaintiffs is not kept alive long enough to be saved by the one-year prescription from the date of the filing of the suit, to wit: August 18, 1950.

Omitting the naming of the Louisiana statutes providing prescriptive periods of less than one year, we have these:

1. One year for certain kind of services and certain kind of debts, LSA–C.C. art. 3534, and for "injurious words," whether verbal or written, and that for damages caused by animals and resulting from offenses, or quasi offenses, LSA–C.C. art. 3536.

2. Prescription of three years under LSA–C.C. art. 3538, which is for certain kind of accounts.

3. Prescription of five years under LSA–C.C. art. 3540, on promissory notes and for nullity, rescission, etc., under Article 3542 and informality in public sales. LSA–C.C. art. 3543.

A careful examination of the language of the several articles of the Code dealing with prescription will disclose that contracts and quasi contracts are not covered, except those coming under the law merchant (negotiable instruments). The law makers, realizing that such a vast number of personal actions had not been covered, provided:

"In general, all personal actions, except those before enumerated, are prescribed by ten years." LSA–C.C. art. 3544.

The language, in other words, is that personal actions, in general, are prescribed by ten years, but those previously especially enumerated are excepted. It appears clear, therefore, that contracts and quasi contracts fall in the general rule established by this article.

The Federal courts, for decades, have recognized the existence of quasi contracts. We quote from 17 C.J.S., Contracts, § 6, "Constructive or Quasi Contracts, p. 322:

■ "Contracts implied in law, more properly termed quasi or constructive contracts, are fictions of the law, actually not contracts, created on principles of unjust enrichment and presumption of performance of duty, without regard to assent of the parties.

"Contracts implied in law, or, as stated supra § 4, more properly quasi or constructive contracts, are a class of obligations which are imposed or created by law without regard to the assent of the party bound, on the ground that they are dictated by reason and justice, and which are allowed to be enforced by an action ex contractu. They rest solely on a legal fiction and are not contract obligations at all in the true sense, for there is no agreement; but they are clothed with the semblance of contract for the purpose of the remedy, and the obligation arises not from consent, as in the case of true contracts, but from the law or natural equity. Such contracts rest on the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another, and on the principle that whatsoever it is certain that a man ought to do, that the law supposes him to have promised to do. So, when the party to be bound is under a legal obligation to perform the duty from which his promise is inferred, the law may infer a promise even as against his intention. In order that a contract may be implied in law from the wrong of a party, it must have been committed with the intention of benefiting his own estate. Moreover, where there is an express contract, the law will not imply a quasi or constructive contract."

And, as late as in 1941, the Louisiana Supreme Court used in the case of Kramer v. Freeman, 198 La. 244, 252, 3 So.2d 609, 611–612, the following language:

"In delving for the correct solution of this problem, it is necessary, at the outset, to determine whether the acts committed by the defendants, which form the basis of the cause of action, afforded to the plaintiff two remedies— one in tort and one in quasi contract. There can be no doubt that the acts complained of were offenses within the meaning of Article 2315 of the [LSA–] Civil Code and that the plaintiff had a cause of action to recover all of the damages he suffered as a result of these torts. In addition to this, the wrongful taking and detention of plaintiff's property by the defendants imposed upon them an implied contractual obligation to return it and the plaintiff had the right to proceed in an action ex contractu to compel them to do so. See Articles 2292, 2293; 2294 and 2301 of the [LSA–]Civil Code; Morgan's Louisiana [& T. R. &. S. S.] Co. v. Stewart, 119 La. 392, 44 So. 138; Ducros v. St. Bernard Cypress Co., 164 La. 787, 114 So. 654; Roney v. Peyton, La.App., 159 So. 469; Smith v. Phillips, 175 La. 198, 143 So. 47; Bryceland Lumber Co. v. Kerlin, 143 La.

242, 78 So. 482; Bell Lumber Co. v. Stout, 134 La. 987, 64 So. 881; Martin v. Texas Co., 150 La. 556, 90 So. 922; Liles v. Barnhart, 152 La. 419, 93 So. 490; Liles v. Producers Oil Co., 155 La. 385, 386, 99 So. 339, and Carter-Allen Jewelry Co. v. Overstreet, 165 La. 887, 116 So. 222. Article 2301 of the [LSA–]Civil Code provides:

" 'He who receives what is not due to him, *whether he receives it through error or knowingly,* obliges himself to restore it to him from whom he has unduly received it.' (Italics ours.)"

Let us pretermit Section 5 of the Clayton Act, providing for the suspension of prescription, and think of this case as if the Act had neved been passed, then if the applicable Louisiana prescription be ten (10) years, as for a personal action arising under a quasi contract, the case of plaintiffs is alive against all defendants. Its reach would encompass facts back to August 18, 1940. Plaintiffs' picture business started only in 1942.

On August 18, 1950, when this suit was filed, the running of prescription was interrupted as to all defendants against whom prescription could then be effectively pleaded. As to those in whose favor it had run, we do not believe the filing of the suit was a revival. We do hold that a joint tortfeasor, not actually named in the suit but action against whom has not yet been barred, would have the prescription running in his favor interrupted by the suit filed against his joint tortfeasor. See, Frazier v. Hardee, 21 La.Ann. 541; Vredenburg v. Behan, 33 La.Ann. 627; Zeller v. Louisiana Cypress Lbr. Co., 9 La.App. 609, 121 So. 670; Sewell v. Newton, La. App., 152 So. 389; Dodd v. Lakeview Motors, La.App., 149 So. 278; Kramer v. Freeman, 198 La. 244, 3 So.2d 609.

There are conflicts on facts, the determination of which decide the case one way or the other.

Who is right on the tolling of the statute? There is no evidence before us. And, even though we had it as a matter of record, we are of the view that the question is for the jury.

Were there not papers and papers to pass between plaintiffs and defendants? Correspondence, contracts, agreements, reports, certificates, etc.? Not that there must be a contractual relation to bar the tort action; but from these papers would be born the implied obligation, making it an action in quasi contract.

After reading the Paramount cases, we are impressed with the multifariousness of relations existing between those engaged in the moving picture business. It is on the question as to whether it be an action in tort or an action on quasi contract that, without a full hearing, we are baffled. Frankly, there is so very little of the facts of the case before us that we are unable to reach a decision now.

And we so hold as to both manners of prescription; (a) the one-year or the 10-year and, also, (b) the influence of the decrees and judgments under the provisions of Section 5 of the Clayton Act.

Accordingly, the plea of prescription is referred to the merits, when the facts of the whole case will be before us, to be then decided upon motion for a directed verdict, if any is filed, or to be decided by the jury under an appropriate charge.